IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RICHARD K. ELLIS,
5350 E. Deer Valley Drive, # 4235
Phoenix, AZ  85054

        Plaintiff,

v.

MARTIN J. GRUENBERG,
Chairman, Federal Deposit Insurance Corporation,
550 17TH Street, NW
Washington, DC 20429

        Defendant.

Civil Action No. 1:15-CV-25

## COMPLAINT
(Employment Discrimination and Reprisal)

### Introduction

1.     Plaintiff Richard K. Ellis brings this action pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Act of 1972, 42 U.S.C. §§2000e-2 *et seq.,* and as further amended by section 102 of the Civil Rights act of 1991, to remedy acts of discrimination in employment practices and the creation of a hostile work environment by the Federal Deposit Insurance Corporation ("FDIC" or "Corporation") based on sexual harassment and in retaliation for his opposing sexual harassment and filing a discrimination complaint.

### Jurisdiction

2.     This Court has jurisdiction over the subject matter of this civil action pursuant to Title VII of the Civil Rights act of 1964 as amended ("Title VII"), specifically 42 U.S.C. § 2000e-

16(c). Plaintiff has exhausted his administrative remedies having filed a formal EEO complaint on March 24, 2014 with the FDIC. More than 180 days have passed since Plaintiff has filed the complaint and the FDIC has not issued a final agency decision.

## Venue

3. Venue is proper in the District of Columbia pursuant to 42 U.S.C. § 2000e-5(f)(3), the respondent having his principal office in this District.

## Parties

4. **Plaintiff, Richard K. Ellis**, is a 48-year old male citizen of the United States and of the State of Arizona. He was formerly employed as an EEO Specialist/Sign Language Interpreter, CG-12, by the FDIC's Diversity and Affirmative Employment Section ("DAES"), Special Programs Branch, Office of Minority and Women Inclusion ("OMWI").

5. **Defendant, Martin J. Gruenberg**, is the Chairman of the FDIC, an independent government corporation within the Executive Branch of the Government of the United States, which has more than 500 employees in 20 or more calendar weeks in each of the last five years. The FDIC is managed by a five-member board of directors appointed by the President and confirmed by the Senate. As Chairman of the FDIC, Mr. Gruenberg is the head of the FDIC and is responsible for the personnel actions, omissions, and practices thereof. Mr. Gruenberg was confirmed as the FDIC Chairman on November 15, 2012. Thus, Mr. Gruenberg is here sued

only in his official capacity as Chairman of the FDIC, within the meaning of 42 U.S.C. §20003-16.

At all times relevant hereto, the employees mentioned herein were employees of the FDIC and were acting within the scope and course of their employment.

a) **Greg Cofer**, Chief of Special Programs, OMWI. Mr. Cofer was the second-level supervisor to and sexually harassed and retaliated against Plaintiff. Mr. Cofer is openly gay.

b) **Anthony Pagano**, Chief, (DAES), Special Programs Branch (SPB), OMWI. At all relevant times Plaintiff reported directly to Mr. Pagano who acted as an instrument of Mr. Cofer's retaliation.

### Statement of Facts

6. Mr. Ellis was employed by the FDIC beginning in 2007 in the position of EEO Specialist/Sign Language Interpreter, CG-12, DAES, SPB, OMWI. He holds a Bachelor's and Master's Degree.

7. Mr. Ellis's work performance has been exemplary. In every performance evaluation since 2007, Mr. Ellis has met or exceeded expectations in every performance category. In addition, he has received numerous awards from the FDIC, the Department of Labor, and other agencies and organizations for his work with the Deaf and People with Disabilities.

8. At all relevant times, Mr. Ellis directly reported to Anthony Pagano, the Chief of DAES. Cofer served as the second level supervisor to Mr. Ellis and was the direct report for Pagano.

9. Cofer began harassing Mr. Ellis in early 2013 when he learned that Mr. Ellis was getting divorced.

10. The first incident of harassment occurred around March 2013 when Cofer and Mr. Ellis were making travel arrangements to attend a work-related conference. Cofer told Mr. Ellis to sit at Cofer's computer. As Mr. Ellis sat in front of the computer, Cofer stood behind him and began massaging Mr. Ellis's shoulders. Mr. Ellis, shocked by this unwanted and unsolicited advance, told Cofer that he had to leave, and then promptly left the office.

11. A few weeks later in April 2013, Cofer was in Mr. Ellis's office discussing work. While Mr. Ellis was seated at his desk, Cofer walked behind him and again began massaging Mr. Ellis's shoulders. Mr. Ellis told Cofer "Please, don't do that," and turned his shoulders away from Cofer to force him to stop.

12. A few days later, Cofer again tried to massage Mr. Ellis's shoulders while in Mr. Ellis's office. Mr. Ellis jerked away and sternly said, "Don't do that!"

13. Between these events in April and June 2013, Mr. Ellis was deeply distressed by Cofer's harassment and avoided contact with Cofer unless directly summoned to his office.

14. In June 2013, Cofer summoned Mr. Ellis to his office ostensibly to discuss a work issue. Mr. Ellis, attempting to keep some distance from Cofer, stood in the doorway and asked what was wanted. Cofer told Mr. Ellis to come stand in front of him beside the desk. When Mr. Ellis did so, Cofer told Mr. Ellis to turn around with his back to Cofer. When Mr. Ellis turned around, Cofer stuck his finger into a hole beside Mr. Ellis's right rear pants pocket and stroked Mr. Ellis's buttocks.

15. Mr. Ellis jerked away in shock and embarrassment while Cofer laughed uproariously.

16. Mr. Ellis was so upset by this incident that he stormed out of the office and went home early.

17. Soon after this latest harassment, in June 2013, Cofer again called summoned Mr. Ellis to his office. When Mr. Ellis arrived and stood in the doorway, Cofer held up a sheaf of papers and told Mr. Ellis he had signed the paperwork for a promotion for Mr. Ellis to a CG-13 Lead Interpreter position and would forward it to Melodee Brooks, Acting Director of OMWI for approval.

18. Mr. Ellis never received a promotion and never heard anything of it again. In fact, when Mr. Ellis later asked Ms. Brooks about the paperwork, she said she never received it.

19. Soon after Cofer's implication that he had recommended Mr. Ellis for a promotion, Mr.

Ellis's mother had to be hospitalized near her home in Winchester, VA, for a heart condition.

20.     Mr. Ellis went and stayed in the hospital with his mother while she was being treated.

21.     Cofer owns a second home near Winchester, VA.

22.     During the few days Mr. Ellis was with his mother and away from work, Cofer repeatedly called, emailed and texted Mr. Ellis, pressuring him to come stay at Cofer's home with him.

23.     Mr. Ellis was terribly distressed by this and Cofer's audacity in harassing him even when his mother was in the hospital with a serious medical condition. The stress of this situation was immense and caused Mr. Ellis severe physical and emotional distress.

24.     Beginning in April 2013, and increasingly throughout 2013 as Mr. Ellis continued to rebuff Cofer's sexual advances, Cofer retaliated against Mr. Ellis by assigning additional tasks to Mr. Ellis, many of which were the responsibility of Cofer and outside of Mr. Ellis's duties.

25.     This workload became increasingly demanding on Mr. Ellis throughout the summer and fall of 2013.

26.     In October 2013, during a business trip to Los Angeles, Cofer insisted Mr. Ellis accompany him to dinner. Cofer tried to buy dinner but Mr. Ellis refused. After dinner, Cofer

pressured Mr. Ellis to have a drink with him at a gay bar. Mr. Ellis had one beer before insisting that they return to the hotel. Upon arriving at the hotel, Cofer asked Mr. Ellis up to his room. Mr. Ellis refused.

27. Mr. Ellis was increasingly distressed over the continued and increasing harassment by Cofer and by Cofer's retaliation. Mr. Ellis was emotionally distraught, and had trouble sleeping and eating.

28. In addition to these direct acts, Cofer also used Tony Pagano, Mr. Ellis's direct supervisor, to further his harassment and retaliation by orchestrating a confrontation between Mr. Ellis and Pagano during the drafting of an annual report regarding the hiring and retention of disabled veterans (the "DVAAP Report" or "Report").

29. For several years prior to 2013, Mr. Ellis helped gather the statistics and narrative summaries for the Report, and Pagano drafted and/or approved the final language. The content of the Report comes from various divisions within the FDIC and does not change widely year to year. Mr. Ellis historically has not been primarily responsible for drafting the content of the Report, nor for its final form.

30. Just after Cofer returned from the trip to Los Angeles, where Mr. Ellis once again rebuffed his advances, Cofer instructed Pagano that Mr. Ellis was to be primarily responsible for the report instead of Pagano. Upon information and belief, Cofer did so to once again increase Mr. Ellis's workload and to create a situation where Mr. Ellis's performance could be criticized

by Pagano.

31. Mr. Ellis dutifully worked on the DVAAP Report throughout November.

32. Cofer scheduled a meeting with Pagano and Mr. Ellis for November 20, 2013 in Cofer's office to go over the Report. This meeting lasted for several hours while Pagano questioned Mr. Ellis regarding aspects of the Report. Mr. Ellis, not having drafted most of the language, could not explain what other divisions meant by what they drafted. Pagano became increasingly angry, yelling and cursing at Mr. Ellis, mocking him and calling him names.

33. During this meeting Mr. Ellis was deeply distressed; his hands shook, he cried in frustration, was sick to his stomach. Cofer did nothing to prevent this conduct by Pagano.

34. Several times during this hours-long meeting, Pagano tried to leave the meeting to get under control. Cofer refused to allow Pagano to leave, forcing the grueling confrontation to continue.

35. After several hours of this berating conduct, Pagano briefly left the room to use the restroom. Cofer turned to Mr. Ellis, smiled lewdly and said, "He's tearing you a new asshole for me." Mr. Ellis was so shocked at this he asked Cofer to repeat it, which he did. Mr. Ellis was disgusted and distressed by Cofer's statement and the clear message that this was all in retaliation.

36. Pagano is known to have difficulty controlling his temper, is easily frustrated, and has been abusive to subordinates when angry or frustrated. Upon information and belief, Cofer purposefully orchestrated this entire confrontation in retaliation for Mr. Ellis's rebuffs of Cofer's sexual advances.

37. After several hours of being yelled at, mocked, and otherwise abused by Pagano, Mr. Ellis was required to work late making changes to the Report, working well past his normal work period of 4:00 PM.

38. That night, Mr. Ellis did not sleep, could not eat, and dreaded the next day when he was again supposed to meet with Cofer and Pagano.

39. On November 21, Cofer, Pagano and Mr. Ellis met again to go over the night's changes. Pagano again yelled at Mr. Ellis for several hours, again called him names, mocked him and swore at him.

40. Despite such treatment being in direct violation of FDIC policy, Cofer did nothing to prevent Pagano's bullying and abuse.

41. After this second meeting on November 21, 2013, several of Mr. Ellis's coworkers asked him if he was OK, as they had all heard Pagano's yelling and abuse.

42. Mr. Ellis was utterly distraught after these grueling sessions of abuse by Pagano,

orchestrated by Cofer. He was physically ill, could not sleep or eat, and loathed the thought of coming back to work.

43.    Mr. Ellis was so upset he sought professional psychological treatment, which continued for more than a year.

44.    Two weeks after the November 20 – 22, 2013 meetings, Mr. Ellis filed a complaint against Cofer and Pagano with FDIC management, which culminated in the filing of a formal EEO complaint on March 24, 2014, which is the subject of this suit. Subsequently, in October, 2014, the Mr. Ellis resigned from his position with the FDIC.

45.    The FDIC has conducted an investigation regarding the formal complaint, but has not issued a final agency decision.

## Statement of Claims

### COUNT I

Sex Discrimination/Sexual Harassment

46.    Plaintiff re-alleges and incorporates paragraphs 1 through 45 above as though fully set forth herein, and in addition avers that:

47.    The conduct of Defendant and his employees substantially interfered with the employment of Plaintiff and created a discriminatory, hostile, intimidating, and offensive work environment.

48. Defendant's conduct further violated Plaintiff's rights in that:

a. It failed to provide Plaintiff with employment conditions and relationships where he could work safely, free from harassment.

b. It failed to respond promptly to Plaintiff's complaints of harassment/discrimination.

c. It failed to thoroughly investigate Plaintiff's complaints of harassment/discrimination and reprisal.

d. It failed to take appropriate action when it knew or should have known of the harassment allowed to exist in the Plaintiff's workplace.

e. It failed to promptly discharge, suspend, reprimand, or otherwise discipline the supervisors who perpetuated, acquiesced, or ignored the harassment.

49. The harassment suffered by Plaintiff was severe, pervasive, and altered the terms and conditions of his employment.

50. The harassment intensified over time.

51. Defendant was aware of the harassment yet took no corrective action.

52. The harassment was perpetrated by supervisory personnel of the Defendant and his employees.

53. Such conduct has denied Plaintiff his civil rights as guaranteed by the Laws of the United States of America.

54. As a direct and proximate result of said unlawful employment practices and disregard for the Plaintiff's rights and sensibilities, Plaintiff has suffered emotional trauma, humiliation, loss of benefits, distress, mental anguish, medical expenses, and other costs.

55. Defendant's actions have caused Plaintiff to suffer harm and injury to his good reputation, extreme mental anguish, embarrassment among friends and co-workers, disruption of his personal life, lost income, benefits, and opportunity for advancement, and the loss and enjoyment of the ordinary pleasures of everyday life.

## COUNT II

### Retaliation

56. Plaintiff re-alleges and incorporates paragraphs 1 through 55 above as though fully set forth herein, and in addition avers that:

57. Plaintiff engaged in the protected activity by filing a complaint regarding and resisting

Defendant's sexual harassment.

58. Defendant retaliated against Plaintiff by refusing to promote him despite being qualified for promotion and Defendant's assertion that he had approved such promotion.

59. The conduct of Defendant, as specified above, constitutes retaliation in violation of §704 of the Civil Rights Act of 1964 as amended, 42 U.S.C. §2000e(3)(a).

WHEREFORE, Plaintiff prays for the following relief:

- A. For Count I, award compensatory damages against Defendant in the amount of $300,000.00 dollars.
- B. For Count II, award compensatory damages against Defendant in the amount of $300,000.00 dollars.
- C. Award punitive damages as allowed by law.
- D. Award reasonable attorney's fees and costs of this suit.
- E. Such other relief as this Honorable Court deems just and proper under the circumstances.

### Jury Demand

Plaintiff hereby requests a jury trial on each and every count.

Dated: January 8, 2015               By: _____
                                         Bennett B. Borden
                                         DRINKER BIDDLE & REATH LLP
                                         1500 K Street, NW
                                         Washington, DC 20005-1209
                                         Telephone:  (202) 842-8822
                                         Facsimile:  (202) 842-8465
                                         DC Bar Nbr. 501228

                                         Attorneys for Plaintiff